MONTICELLO, The (DOLNER v.).  See Case No. 3.971.

MONTREAL OCEAN STEAMSHIP CO. (CRERAR v.).  See Case No. 3,387.

## Case No. 9,740.

### The MONTSERAT.

GEIGER et al. v. The MONTSERAT.

[6 Adm. Rec. 83.]

District Court, S. D. Florida.  May 10, 1858.

SHIPPING—MASTER—REFUSAL OF COURT TO RETURN VESSEL AFTER DECREE.

[A court of admiralty, after decreeing salvage, may refuse to restore the ship and cargo to the master if the interests of the owners and consignees seem to call for such refusal.]

[This was a libel for salvage by John H. Geiger and others against the brig Montserat and cargo.]

Miner Bethel, for libellants.

S. I. Douglas, for respondent.

MARVIN, District Judge.  The libel, answer and proofs, in the case show that this brig laden with a cargo of tobacco, flour and staves, was aground on a rocky bottom, at the northwestern end of the Marquis Keys, in a dangerous situation, lying in 9 feet of water, drawing 11 feet; that the libellants, 23 in number, in three vessels, hearing, at this place, through the master, who arrived here in his boat, of the brig's disaster, proceeded to her, and found her in the situation described.  They were employed by the master to assist in relieving her. The libellants carried out a heavy anchor astern, lightened the brig of between 50 and 60 tons weight of the cargo, and heaved her off the bottom, and brought her to this port.  They were employed in this service three days.  The brig has been appraised at $700, and the cargo at $18,000, making the total value of vessel and cargo $18,700.  Under the circumstances, I think that one sixth of the value, or $3,116, is a reasonable salvage, $3,000 of which is to be paid by the cargo, and $116 by the vessel.  This sum will make the men's shares a little less than $50.

There are other features in the history of this case to which it is necessary to advert. It appears from the bills of lading, that the cargo consists of 102 hhds. of tobacco, shipped at New Orleans by Messrs. Castillo and Harispe, and consigned to Don Jose Ayarza,

in Bilboa, Spain; 200 bbls. flour, shipped by the same, consigned to B. Beguirie & Co., Bordeaux, France; 13,200 staves, shipped by Paul Inge Fils & Co., consigned to order; and one corn-sheller, shipped by J. M. Basnaldo & Co. consigned to Don Pablo De Epulza in Bilboa.  From the testimony of the mate, corroborated by that of the master, it further appears that the brig sailed on her voyage from New Orleans, on the 23rd of last March; that the second day out, the vessel began to leak (the master says during a heavy S. E. gale), which induced the master, on the remonstrance of the crew to make for the nearest port.  It further appears from the testimony of the mate, fully corroborated by that of the master, that when within 18 miles of this port, in good weather, in the day time, with land in plain sight, and with a fair wind to keep off the shore and to come to this place, the brig was pointed towards the land, and run aground, in the place where the libellants found her.  She was run aground, the master says, to save the cargo.  It does not appear that the vessel leaked much while ashore, and probably not much injured while aground, as the weather was good; nor does it appear that she leaked much, if any, while being brought into this port, in charge of the libellants.  The libellants do not allege that she leaked, or that they had occasion to pump her, which they would have been likely to aver had the fact been so in order to enhance the value of their services; nor does it appear, that she has leaked since her arrival in port more than vessels usually do.  The cargo has been unladen, and the bottom tier of the hhds. of tobacco is found to have been slightly wetted, on the under side.  Surveyors appointed by the court to examine and report the condition and value of the vessel report that they find the forward ends of her deck plank under the quick work decayed; quick work in many places decayed; quick work at break of deck, the ends of the plank, decayed; her top throughout chafed, and seams open; deck worn out, and from appearance leaks badly.  On boring her, on both sides, near the floor heads, they found the timbers somewhat decayed, but generally good for a vessel of her age; her tree-nails throughout much decayed; and her fastenings rusted out; chain bolts very much worn and rusted. They report, that they do not consider her seaworthy, or in condition to carry a cargo to any port, coastwise or foreign, without large repairs; that her present value is $700; and that it would cost $3,000 to put her in a condition to carry a cargo to a foreign port; and that she would not sell, when repaired, for the cost of repairs.  The surveyors did not see the bottom of the vessel, and do not appear to have made any report upon any injuries she may have sustained while aground.

Upon this statement of facts, it seems impossible to conceive that this master did not know that, at the time he took this cargo in

and sailed from New Orleans, the vessel was in an unfit and unseaworthy condition to carry her cargo to its port of destination; but, however unseaworthy the vessel was, it does not appear to have leaked so badly as to have made it necessary to run the vessel aground, within 18 miles of this port, in good weather, and with a fair wind into port, in order to save the cargo. According to the master's account he must have sailed some four or five hundred miles after the leak commenced before she was run ashore, during all which time he kept the leak down.

The question arises, what disposition ought the court to make of the brig and cargo? They have both been attached by the marshal, and are in custody of the court, on libel for salvage. The master claims them virtuti officii for and on account of whom it may concern, and there is no person before the court to controvert his claim. He is competent in law, as the agent of whoever may be concerned, to make the claim. In ordinary cases, the property or its proceeds, upon satisfaction of the demand for which it was arrested, is restored to the claimants by order of the court, granted as a matter of course. But it is not restored without such order, unless by the marshal, under the act of the 3rd of March 1847 [9 Stat. 181]. To say nothing touching the restoration of the vessel, the owner of which appointed the master, and resides in this country, and has an opportunity to take any measures he may think proper to protect his own interests, is it the duty of the court, in the present case, and under the facts stated, and at the present time, to make an order to restore the cargo to the master, without imposing such conditions as will afford some assurance that the owners or underwriters will, in the end, probably receive it? I think it is not its duty to make such order. On the contrary, I think it is its duty, in the exercise of a sound discretion for the furtherance of justice, to postpone making any order for the delivery of this cargo to the master, until the owners in Spain and France have had full time allowed them to intervene in the cause in person, or by a special agent, and present their bills of lading, and claim their goods, unless the master shall choose to charter another vessel, and reship the goods direct to the original port of destination, which I think it is his duty to do, if he can procure a vessel in this port or in Narana on reasonable terms.

Upon payment of the salvage and expenses, which can be raised upon a respondentia bond, and upon a reshipment of the goods, and bills of lading being signed by the new master to deliver them, in Bilboa and Bordeaux, to the consignees, the order of restitution may be made and the custody of the marshal be withdrawn. Otherwise, I think the cargo should remain in store, and the owners advised of the facts; or if it is likely to deteriorate much in value on account of its being detained in store several months, in this climate, I think it should be sold, and the proceeds retained in the registry of the court to await the orders of the consignees or owners upon the production of their bills of lading. [U. S. v. 422 Casks of Wine] 1 Pet. [26 U. S.] 550; The Eliza [Case No. 4,-346].